# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                    Case No. 05-CR-10

TROY EBROIS TUCKER,

    Defendant.

## RECOMMENDATION TO CHIEF UNITED STATES DISTRICT JUDGE RUDOLPH T. RANDA

On January 4, 2005, a federal grand jury in this district returned a one-count indictment against defendant Troy E. Tucker, charging him with possessing a firearm after having previously been convicted of a felony in violation of Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The defendant was arraigned on February 11, 2005, and entered a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant filed a motion to suppress. (Docket #9).

On March 23, 2005, the court held an evidentiary hearing on the defendant's motion. Testifying on behalf of the government were Milwaukee Police Department (MPD) officers Shawn Lauda and Richard Scharnott and MPD Detective Kevin Armbruster. Venita Cromwell, Lajuana Gardner, and Sonia Downey testified on behalf of the defendant. Based upon the testimony adduced at the hearing, the court makes the following findings of fact and recommendation for the proposed disposition of the defendant's motion to suppress.

## FINDINGS OF FACT

On August 31, 2004, at approximately 5:20 p.m., MPD Officer Shawn Lauda and MPD Detective Kevin Armbruster were traveling in an unmarked squad car in the area of 33rd Street and Cherry Street in Milwaukee, Wisconsin. The area is a high crime area which has experienced drug dealing and violent criminal activity. The officers were a few blocks from 33rd and Cherry Streets when they saw Troy Tucker, the defendant, go through a stop sign without making an appropriate stop. Officer Lauda was familiar with the defendant and his vehicle, a 1998 red Ford Taurus. When they observed the red Taurus, Officer Lauda said, "that's Troy." The officers were about one and a half blocks behind the defendant's vehicle at the time. They proceeded to follow the defendant vehicle.

Prior to August 31, 2004, two confidential informants had provided information to the Milwaukee Police Department that the defendant was a high level drug dealer and that he carried a weapon. The officers had no information that the defendant was carrying a gun on August 31, 2004. According to Officer Lauda, the confidential informants were deemed to be reliable because they previously had provided information for multiple search warrants for drugs and guns and had made controlled buys of controlled substances. In addition, their information was corroborated by independent police work.

The officers observed the defendant slow down at the stop sign at 33rd and Cherry Streets, but he did not stop, which is a traffic violation. The defendant, who was alone in the vehicle, made a right-hand turn. The officers followed the defendant for awhile and observed him make a right-hand turn onto 33rd Street. As the defendant approached the stop sign at Vliet Street, the defendant noticed the officers and appeared to be concerned that the police were following him. Although the officers were in an unmarked squad car, the vehicle, a Ford Crown Victoria, is fairly easily identifiable as a police vehicle.

Officer Lauda and Detective Armbruster both observed the defendant look in the rearview mirror and side view mirror several times. He also leaned forward in the vehicle and leaned to his right with his right shoulder dipping toward the floor. It looked like he was trying to move things around or to conceal something. The defendant's movements were quick and he appeared to be nervous. The officers were concerned that the defendant might have a gun in his car, although they had no evidence that he was carrying a weapon that day.

After the defendant turned onto Vliet Street, the unmarked squad car activated its lights and the defendant pulled over. The defendant stopped his car. Officer Lauda went to the driver's side of the vehicle and said to Detective Armbruster, "this isn't Terrell," which was a ruse. Officer Lauda then began talking to the defendant. He told the defendant that he was pulled over for disregarding a traffic sign on 33rd and Cherry Streets and asked for the defendant's identification. The defendant gave him an identification card in the name of Zenas Tucker. Officer Lauda knew that the defendant had used the name Zenas Tucker in the past. He did not know if the defendant had a valid driver's license. At the time of the stop, Officer Lauda knew that the defendant had some felony drug convictions.

Detective Armbruster also exited the vehicle and went to the passenger side of the defendant's car. He had his weapon drawn. The window was down on the passenger side and Detective Armbruster looked inside the vehicle for safety reasons. He observed a dog in the back seat and also saw the butt of a handgun sticking out from the handrest area between the two front seats. The gun was under the folding console, under the armrest. Initially the defendant was very cooperative and polite. Officer Lauda asked the defendant if he had anything in the car he should not have. The defendant said, "no." However, when Officer Lauda asked permission to search the vehicle, the defendant said that he could not search the car. After the traffic stop, and based on the defendant's movements and Officer Lauda's

prior knowledge about the defendant, he was going to search the car for guns for his own safety. Officer Lauda did not see the dog in the car.

Officer Lauda ordered the defendant out of the car. The defendant was visibly shaking and agitated. Officer Lauda opened the car door and had his hand on his gun. The defendant was not complying with his order to exit the vehicle so Officer Lauda told him that he should come out or he would have to get the defendant out of the car. He opened the driver's side door.

When Detective Armbruster observed the gun inside the car, he opened the passenger door and started to go into the vehicle. The defendant looked at Detective Armbruster. Detective Armbruster's upper body was in the vehicle when the defendant observed him. The defendant then put the car into drive, the tires squealed, and the car sped off. Officer Lauda let go of the driver's door, but he still had the defendant's identification card in his possession.

As the car sped away, the passenger door pinned Detective Armbruster's arm inside and he fell onto the curb. Detective Armbruster told Officer Lauda that he had seen the butt of a gun in the car. He also told Officer Lauda to go after the defendant while he recovered the items that the defendant had dropped. Officer Lauda took off after the defendant's vehicle. He contacted the dispatcher and filed a CAD report regarding the incident, giving the defendant's name, physical description and license plate number. The defendant's vehicle was located in the rear of 1440 North 28th Street by MPD Officer Rabideau.

Officer Lauda went to 1440 North 28th Street, arriving at approximately 5:30 p.m. When he arrived, he talked to the officers at the scene. Officer Lauda was not familiar with the 1440 North 28th Street address. It was not the defendant's residence and was not listed as the defendant's residence on his identification card.

There were a few Hispanic males in the area painting a nearby house. They told the officers that a red car had driven up quickly and parked and that they then heard gun shots. Other people in the area advised the officers that the vehicle had skidded to a stop and parked. They then heard a gunshot and the door to the lower unit of 1440 North 28th Street slam. People also were heard screaming in the lower unit.

MPD Officer Richard Scharnott was on uniformed patrol on August 31, 2004, and went to the residence at 1440 North 28th Street. When he arrived he heard a woman from the upstairs unit calling down to officers. She said that she heard a gunshot, the door to the lower unit slam, and that she then heard yelling and screaming from the occupants in the lower unit. Officer Scharnott knocked on the lower unit door announcing, "Milwaukee Police Department," and asked that the door be opened.

Meanwhile, Detective Armbruster was picked up by a squad car and taken to 1440 North 28th Street. When he arrived, the people in the upstairs unit called down to him from the back porch. They reported that they heard screeching tires, a gunshot, and the door to the lower unit slam shut. They also heard screaming coming from the front of the lower unit. Detective Armbruster then went upstairs to talk to the occupants. They did not recognize the red vehicle that had pulled up to the house.

Officers were interviewing people in the neighborhood, including the people in the upper unit at 1440 North 28th Street and reporting the information to Officer Lauda. Based on the information he received, Officer Lauda believed that the defendant might have run into the lower unit and might be holding people hostage. He talked to a woman in the first floor unit through the window. She was very nervous and would not open the door. She did not say that she was in danger or that there were other persons in the house. Officer Lauda decided to make a forced entry to see if any people were being harmed. MPD Officer Joe Warren was

told to kick out the front panel of the rear kitchen door and Officer Lauda crawled through the panel. As he was crawling through the door, he saw another officer walk into the living room.

While he was standing in front of the house, Officer Scharnott observed a woman, subsequently identified as Lujuana Gardner, walking up to the residence with keys in her hand. He told her what had happened in the backyard. The parties dispute what subsequently occurred. According to Officer Scharnott, the woman said she lived in the house with her children. When Officer Scharnott asked if he could check the house, she said, "yes, please do, please do." She opened the door with her keys. Prior to the woman's arrival at the house, Officer Scharnott had observed a child in the front window. When he entered the home, Officer Scharnott observed several children in the house with an adult woman. No other officers were in the residence when Officer Scharnott entered, but other officers entered within about five seconds.

When Officer Lauda entered the residence, he observed a door to the right-hand side of the kitchen that led to a bedroom. The defendant came out wearing a different shirt than he had previously worn when his vehicle was stopped. Office Lauda grabbed the defendant's left arm and said he was under arrest. The defendant yanked his arm away and tried to elbow Office Lauda. There was a brief struggle before the defendant was taken into custody.

The investigation continued outside. An officer located a gun near the defendant's car as well as a shell casing. Detective Armbruster said that the butt of the gun looked the same as the gun butt that he had seen in the defendant's vehicle.

The defendant was issued a traffic citation. The information on the ticket given to the defendant was based on information on the defendant's identification card. Officer Lauda talked to Deputy Freuck on September 2, 2004, and Deputy Freuck said he would serve the traffic citation on the defendant who was in jail at the time.

- 6 -

Case 2:05-cr-00010-RTR    Filed 05/02/05    Page 6 of 18    Document 23

Venita Cromwell testified that she lives at 1440-A North 28th Street. On April 31, 2004, at about 5:30 p.m. on that day, she was in the kitchen washing dishes when she heard a gunshot, cars screeching and the downstairs door slam. She also saw police cars in front of the residence. She and her fiancé looked out the kitchen window.

Ms. Cromwell told the police that someone had come inside the lower unit and that she was scared. She explained that the residence shared a common back door and it was open. Ms. Cromwell said that her daughter had recently left the upper unit and the common back door should be open. According to Ms. Cromwell, her fiancé asked the officers if he should come down and open the door, but the officer told him "no" because someone might be there. Ms. Cromwell's fiancé then threw and keys to the back door to the officer. Ms. Cromwell heard people screaming downstairs and the police say, "get down." She did not hear the police say, "let me in." She saw the red car in the back of the house and had seen it before. Ms. Cromwell did not know the defendant.

Ms. Cromwell said that the police officers never said they were concerned for hostages. Ms. Cromwell did not hear screaming from the lower unit before the police came. She heard the screaming downstairs after the door was kicked in. She said that officers went upstairs to the attic and into the basement to check the residence. She also said that an officer came to talk to her and her fiancé inside their home.

Lajuana Gardner testified that she moved into the lower unit at 1440 North 28th Street in March 2004 and that she lives there with her godsister, Sharon Stuart and Sonia Downing. She was not home at 5:30 p.m. and returned to her residence at about that time to find police on her porch knocking on the front door. The defendant is her godsister Sharon Stuart's cousin. He frequently used to come over to the residence. According to Ms. Gardner, the defendant stayed overnight every other day or so and often ate meals at the house. The

- 7 -

Case 2:05-cr-00010-RTR   Filed 05/02/05   Page 7 of 18   Document 23

defendant started staying at the residence after she had moved in in March 2004. He did not have his own bed or bedroom, nor did he have keys to the house. He also kept clothes at the house. He kept clothes in a bag in the living room closet at the residence. Ms. Gardner knew the defendant for a long time, about 14 or 15 years. He lived alone on North 49th Street and used to come to visit frequently.

Ms. Gardner asked the uniformed officer on her porch why he was knocking on her door. He told her that he was concerned that someone might be in the house and he wanted to find that person. Ms. Gardner did not want the officer in her home. She testified that the officer asked her for consent to enter the residence, but she testified that she said, "no." According to Ms. Gardner, the police officer then told her that they were going to have to kick the door in and he went around to the side of the house. The officer kicked the back door in. Ms. Gardner said that the only reason she let the officers in was so that they would not kick in the back door. Ms. Gardner testified that she, Sonia Downey and Sharon Stuart lived in the house.

Ms. Gardner also testified that she had lost her key to her residence a few months prior to August 31, 2004, and had no key on August 31, 2004. To get in and out of the residence, she said she would climb through a window. The house was generally kept locked. Ms. Gardner testified that she asked Sonia to open the door so that she could get in but Sonia would not let her in. Ms. Gardner was not worried that someone whom she did not know might be in her residence.

Sonia Downey testified that she was a friend of Ms. Gardner and often came to visit her. She came to 1440 North 28th Street on August 31, 2004, to visit Ms. Gardner and was at the house at approximately 5:30 p.m. She heard a commotion outside the house and believed that the police were chasing someone. Ms. Downey testified that Ms. Gardner was in the

- 8 -

Case 2:05-cr-00010-RTR    Filed 05/02/05    Page 8 of 18    Document 23

house and ran out when they heard the police sirens. She stated that everyone inside the house went outside, but she remained inside the residence. Ms. Downey also testified that she went out on to the front porch. When she saw nothing outside the residence, she went back inside, used the restroom and watched TV.

When she walked to the back of the residence, Ms. Downey saw the defendant, whom she knew, came out of the back room. He was wearing a blue shirt and blue jeans. She was surprised to see him. The defendant appeared calm and did not say why he was at the residence, although his cousin's children were there. At that time, the defendant was not in the house. She testified that there were a number of people in the lower unit, both children and adults.

Ms. Downey did not live at the residence, although she spent nights there sometimes and kept clothes there. She lived on in the area of 104th Street and Kiehnau Avenue with her brother, Ms. Downey testified that she came to visit Ms. Gardner in the morning and that Ms. Gardner had let her into the residence. Ms. Downey testified that about ten to twenty minutes after she reentered the house, she heard a police officer knocking on the door and window and pounding on the screen with a gun. The officer told her that they had reason to believe that someone ran into the house. She told them that they could not come in because it was not her house and they had no search warrant. Ms. Downey testified that she was not concerned about the safety of herself or the children in the residence. According to Ms. Downey, the officer said to her, "let me in, bitch," as he pounded his gun on the screen.

Ms. Downey also testified that once she knew that Ms. Gardner was outside the residence, she let her in. She did not know why Ms. Gardner did not use her keys to enter the residence. She further testified that other officers kicked in the back door and when they entered the residence, they told her to get on the ground and put a gun in her back. Ms.

- 9 -

Downey testified that the defendant was at Ms. Gardner's residence whenever Ms. Downey was there and kept he kept clothes in a bag in the living room closet. Sometimes Ms. Downey also kept clothes at Ms. Gardner's home.

In rebuttal, Officer Lauda testified that he conducted a follow-up investigation on the incident and interviewed various persons, including Lajuana Gardner. In that interview, she told him that she knew the defendant as "Troy" and that at no time did he have consent to go to her house. She also told him that the defendant did not live there and did not have consent to be in her house. Ms. Gardner told Officer Lauda that only she and her two children lived at the house on August 31, 2004.

## **ANALYSIS**

Defendant Tucker maintains that the traffic stop that led to his identification was made without probable cause or reasonable suspicion. He further asserts that the warrantless search of the residence at 1440 North 28th Street was done without consent and that no exigent circumstances justified the warrantless entry.

In opposing the motion, the government asserts that the officers had sufficient cause to stop the defendant's vehicle and that exigent circumstances justified the warrantless search of the residence at 1440 North 28th Street. The government also asserts that the officers had consent to conduct the search. The government also challenges the defendant's standing to challenge the search of the residence.

The court will initially address the standing issue. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133-34 (1978), reh'g denied, 439 U.S. 1122 (1979). "[R]ights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the

- 10 -

Case 2:05-cr-00010-RTR    Filed 05/02/05    Page 10 of 18    Document 23

search and seizure." Id. at 138. Thus, the question is whether the challenged search or seizure infringed an interest of the defendant which the Fourth Amendment was designed to protect. Id. at 140.

A defendant's Fourth Amendment rights are violated only when the challenged conduct invades the party's legitimate expectation of privacy rather than that of a third party. United States v. Payner, 447 U.S. 727, 731, reh'g denied 448 U.S. 911 (1980); United States v. Williams, 737 F.2d 594, 616 (7th Cir. 1984). An individual has the burden of establishing a legitimate expectation of privacy. United States v. Ruth, 65 F.3d 599, 605 (7th Cir. 1995); United States v. Peters, 791 F.2d 1270, 1281 (7th Cir.1986). As explained in Peters, 791 F.2d at 1281:

> [T]he Supreme Court has stated, 'this inquiry . . . normally embraces two discrete questions.' The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy' -- whether . . . the individual has shown that 'he seeks to preserve [something] as private.' The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as reasonable' -- whether the individual's expectation, viewed objectively, is 'justifiable' under the circumstances," Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed. 2d 220 (1979) (quoting Katz v. United States, 389 U.S. 347, 353, 351, 361, 88 S.Ct. 507, 512, 511, 516, 19 L.Ed. 2d 576 (1967) (citations omitted)).

There is no "bright line" test; rather, the determination is based on analysis of whether the facts of a particular case give rise to a legitimate expectation of privacy. Rakas, 439 U.S. at 144. The factors relevant to application of the two-prong test for a legitimate expectation of privacy are:

> [1] whether the defendant has a possessory [or ownership] interest in the thing seized or the place searched, [2] whether he has the right to exclude others from that place, [3] whether he has exhibited a subjective expectation that it would remain free from governmental invasion, [4] whether he took normal precautions to

>maintain his privacy and [5] whether he was legitimately on the premises.

Peters, 791 F.2d at 1281 (citing United States v. Haydel, 649 F.2d 1152, 1155 [5th Cir. 1981]); see also, United States v. Duprey, 895 F.2d 303, 309 (7th Cir. 1989).

In Minnesota v. Olson, 495 U.S. 91, 96 (1990), the court held that "[the defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." The court explained that "[t]o hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the every day expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." Minnesota v. Olson, 495 U.S. at 98.

In this case, the testimony showed that although the defendant did not live at the 1440 North 28th Street residence, he was a cousin of Sharon Stuart and stayed at the residence frequently. He was always at the residence when Ms. Downey was there. The defendant kept clothes in a bag in the living room closet and often ate meals at the home. Accordingly to Ms. Gardner, whose credibility is questionable, the defendant stayed overnight at her home about every other day. While the issue of the defendant's standing to challenge the search of the residence is a very close question, the court finds that the defendant has standing to challenge the search of the 1440 North 28th Street residence.

### **Vehicle Stop**

The defendant challenges the stop of his Ford Taurus by Officer Lauda and Detective Armbruster. It is undisputed that traffic violations give police probable cause to stop a vehicle. Atwater v. City of Lago Vista, 532 U.S. 318, 322 (2001). In Whren v. United States, 517 U.S. 806, 809 (1996), the Court held that "as a general matter, the decision to stop an automobile

is reasonable when the police have probable cause to believe that a traffic violation has occurred." The Court rejected the argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. Id. at 813; see also, United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999). Thus, the officers' subjective motivations for making the stop are irrelevant. Whren, 517 U.S. at 813. Once officers stop a vehicle for a traffic offense, they may order the occupants to exit the vehicle pending completion of the stop. See Maryland v. Wilson, 519 U.S. 408 (1997).

In this case, the undisputed facts establish that the defendant's vehicle failed to properly stop at a stop sign at about 5:20 p.m. on August 31, 2004, which was a violation of the traffic laws. Thus, the officers legally stopped the defendant's Ford Taurus.

At the time of the stop, Officer Lauda was aware, based on informant information corroborated by independent police work, that the defendant was a high level drug dealer and that he carried a weapon. Although the officers had no information that the defendant was armed on August 31, 2004, they had a reasonable concern for their safety, especially since they observed the defendant's nervous movements in the vehicle when he noticed the officers following him. Besides looking in his rearview and side view mirrors numerous times, the defendant leaned forward and to the right with his shoulder dipping toward the floor as though he was trying to conceal something.

Detective Armbruster observed the butt of a handgun in plain view in the vehicle when he was standing at the passenger side of the vehicle. The gun butt was sticking out of the armrest area between the two front seats. The officers were aware that the defendant had prior felony convictions. Therefore, the incriminating nature of the gun was immediately apparent. Accordingly, Detective Armbruster had probable cause to seize the gun. In addition, the safety of the officers justified the seizure of the weapon, especially given the

- 13 -

hazardous nature of roadside encounters between police and a suspect. See Michigan v. Long, 463 U.S. 1032, 1049 (1983). Accordingly, this court will recommend that Chief United States District Judge Rudolph T. Randa enter an order denying the defendant's motion to suppress based on the stop of his vehicle.

**Search of 1440 North 28th Street, Milwaukee, Wisconsin**

Warrantless searches are presumptively unreasonable under the Fourth Amendment "subject only to a few specifically established and well delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). One exception to the Fourth Amendment prohibition against warrantless searches arises when voluntary consent is obtained either from the person whose property is searched or from a third party who possesses common authority over the premises. See Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); see also Florida v. Jimeno, 500 U.S. 248 (1991); United States v. Grap, 403 F.3d 439 (2005).

Exigent circumstances may also provide a basis for a warrantless search. Warrantless searches are permissible "when police have a reasonable belief that exigent circumstances require immediate action and there is no time to obtain a warrant." United States v. Kempf, 400 F.3d 501, 503 (7th Cir. 2005); United States v. Jenkins, 329 F.3d 579, 81 (7th Cir. 2003); see also, United States v. Saadah, 61 F.3d 510, 516 (7th Cir. 1995) (citing Michigan v. Tyler, 436 U.S. 499, 509 [1978]). Thus, a warrant must be obtained prior to searching a person's residence "unless 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" United States v. James, 40 F.3d 850, 862 (7th Cir. 1994) (quoting Mincey v. Arizona, 437 U.S. 385, 394 [1978]), vacated on other grounds, 516 U.S. 1022 (1995). **CHECK**

The existence of exigent circumstances is analyzed from the perspective of the law enforcement officers at the scene. Saadeh, 61 F.3d at 516. The question is not what the

- 14 -

officers could have done but rather whether, at the time, they had a reasonable belief that there was a compelling need to act and no time to obtain a warrant. Id. The government bears the burden of proving that its agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry. See United States v. Robles, 37 F.3d 1260, 1263 (7th Cir.1994).

The government contends that the officers obtained consent to search the residence. The standard for measuring the scope of an individual's consent under the Fourth Amendment "is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251; Rodriguez, 497 U.S. at 183-89; United States v. Dorsey, 27 F.3d 285 (7th Cir. 1994). The scope of a search is generally defined by its expressed object. Jimeno, 500 U.S. at 251; United States v. Ross, 456 U.S. 798, 820 (1982). Moreover, consent searches are valid only if the consent was freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

In this case, Officer Scharnott testified that he observed a woman, later identified as Lajuana Gardner, walking up to the residence with keys in her hand. Officer Scharnott testified that the woman said she lived in the house with her children. He told her what had occurred in the back yard, asked permission to enter, and to search the house. According to Officer Scharnott, Ms. Gardner said, "yes, please do, please do." She then opened the door with her keys.

Ms. Gardner presented a different version of events and denied giving the officer consent to enter her home. However, for several reasons, the court finds Ms. Gardner's

testimony not credible. Ms. Gardner testified that she was not home at 5:30 p.m. on August 31, 2004, and came back at about that time to find the police at her door. Yet, Ms. Downey testified that she was at the home with Ms. Gardner at about 5:30 p.m. and that when they heard police sirens, Ms. Gardner and other persons in the residence ran outside to see what was happening.

Ms. Gardner also testified that she, Ms. Downey, and Sharon Stuart lived in the home. Ms. Downey, however, testified that she lived with her brother on 104th Street and Kienau at the time. Furthermore, Officer Lauda testified that when he interviewed Ms. Gardner in his follow-up investigation, she said that only she and her two children lived at the house on August 31, 2004.

The court finds Ms. Gardner's testimony about lacking keys to get into her own home for a number of months prior to August 31, 2004, inherently incredible. According to Ms. Gardner, since the house was generally locked, to get in and out of the residence, she would have to climb through a window. According to Officer Scharnott, Ms. Gardner had keys in her hand when she came to the front door of her residence. Moreover, Ms. Downey, who frequently visited Ms. Gardner, stated that Ms. Gardner had keys to her own home. She also testified that she could not understand why Ms. Gardner did not use her own key to gain entry to her home, instead of asking Ms. Downey to open the door.

The court has carefully considered the evidence presented. Based on the totality of the circumstances, the court concludes that Ms. Gardner freely and voluntarily gave Officer Scharnott consent to enter and to check her home on August 31, 2004.

Even if this court were to conclude the Ms. Gardner did not consent to the search of her residence, exigent circumstances justified the search. At the time the officers entered Ms. Gardner's residence, they knew that the defendant had a gun in his red Ford Taurus and had

- 16 -

Case 2:05-cr-00010-RTR    Filed 05/02/05    Page 16 of 18    Document 23

sped away from officers who had stopped him for a traffic violation. Shortly thereafter, his vehicle was located at the rear of 1440 North 28th Street. Witnesses in the area advised officers who arrived at the scene that a red vehicle had driven up skidded to a stop and parked. A gunshot was heard and the door to the lower unit of 1440 North 28th Street slammed. People were heard screaming in the lower unit. The individuals living in the upper unit at the address confirmed that they heard screeching tires, the door to the lower unit slam, and a gunshot. They also heard screaming coming from the front of the lower unit. They told the officers that they did not recognize the red vehicle.

Officer Lauda also had talked to a woman in the first floor unit through a window when he arrived at the residence. She would not open the door and appeared very nervous. Officer Scharnott had also seen a child in the front window of the unit.

Based on the information the officers had, the officers could reasonably believe that the defendant had entered the lower unit and might be holding people hostage. Under the circumstances, a reasonable officer would have feared for the safety of the occupants of the lower unit. See Jenkins, 329 F.3d at 581; United States v. Webb, 83 F.3d 913, 916 (7th Cir. 1996). Thus, exigent circumstances justified the officers' entry into the residence at 1440 North 28th Street.

In sum, the court finds that the officers had probable cause to stop the defendant's vehicle for a traffic violation. They also had consent from Ms. Gardner to search the residence at 1440 North 28th Street. Furthermore, exigent circumstances justified the officers' warrantless entry and search of the residence. Accordingly, this court will recommend that the defendant's motion to suppress (Docket # 9) be denied.

## CONCLUSION

**NOW, THEREFORE, IT IS RECOMMENDED** that Chief United States District Judge Rudolph T. Randa enter an order denying the defendant's motion to suppress. (Docket # 9).

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 13.03 (E.D. Wis.), whereby written objections to the foregoing recommendation may be filed in duplicate with the Clerk of Court within ten days from the date of service of this recommendation. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 2nd day of May, 2005.

BY THE COURT:

s/Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge